Next case of the morning is number 2460553, Harrison County, Mississippi v. US Army Corps of Engineers. Mr. Weigel. Good morning. May it please the court, Robert Weigel. I'm here on behalf of the plaintiffs and appellants, Harrison County, Mississippi et al. This is a case under the Marine Mammal Protection Act, which, just to set this up a little bit, is an either-or statute. It has an absolute prohibition on the taking of marine mammals such as bottlenose dolphins, and that's very broadly defined to mean hunt, harass, kill, and engage in other actions that disrupt their breeding and other behaviors. So it's absolute, except there are a few ways to get around it, one of which is to get an incidental take authorization under that statute. The complaint in this case, as you know, pled that the Corps of Engineers' operation of the Bonny Cary spillway element of the Mississippi River Tributaries Project resulted in the take of bottlenose dolphins in the Mississippi Sound, which injured Harrison County and the other clients. And I should note that on this record, the take of bottlenose dolphins through the operation of that spillway is not controverted. So that's, on this record, a given. Now, we and the court below, the district court, said that we did not have Article III standing to bring this case. Now, that is something that is familiar to the court and to all of us. We know that we must prove injury in fact, we must prove causation, and we must prove redressability. With causation and redressability being thought of as kind of two sides of the same coin. Now, this is a case in which there were detailed declarations from Harrison County, City of Biloxi, from Dr. Moby Solange, an expert in bottlenose dolphin and marine mammals, from small businesses like Pan Isles Inc., Ship Island Ferry, folks over there. And these, again, were very detailed. They stated the importance of the bottlenose dolphin to their economies, and not just to that, but to their own property interest. Right? Harrison County and Biloxi have their own proprietary interests along the shoreline, littoral and real property rights. How far away, I should have looked this up before, but how far away are Harrison County and Biloxi from where the spillway empties into the Gulf? I'm going to, Judge, I'm going to give you my best guess, which is it's going to be probably around 60, well, around 70 miles. 70 miles? That's correct. So if the dolphins are somewhere where the, are you saying that the water disperses, or the dolphins are stupid, and when the water comes in, when the freshwater comes in, they don't immediately move to more saline conditions? No, that's, the water disperses through the Mississippi Sound. There are barrier islands out there, the Chandelure Islands, Ship Island, Horn Island, Cat Island. Court's familiar with those. Yes, the water comes in. We had extraordinarily fresh water, not just in 2019, but in other years, and finally carried spillway all the way over to the Alabama line. So, yes. So you're saying it mainly gets trapped in the intercoastal canal? No, I don't think that's a record here. What Dr. Solangi, who is our expert on this, and he was working off some extensive mapping that was done by scientists at the University of Mississippi, and, excuse me, Mississippi State and University of Southern Mississippi, showed the way that the water flows, there are specific paths that it takes. So it basically comes in Lake Pontchartrain, out through the Wrigleys, and then comes over to the east. So, and I should note, Judge, I think this is responsive to your question, there's a single population of bottlenose dolphin, the Lake Boudreau population, that inhabits the Mississippi Sound, as well as the areas right there by the Wrigleys, Lake Bourne, Lake Boudreau, and that area. So, but on this record, that's not controverted. Do dolphins regularly travel 60 miles, or is it the carcasses that were moving like that? No, these, the, I don't have the answer to that question for you, Judge, but it's a single population that does interbreed back and forth. So based on what we have in record, I think the answer is yes, they do. And so what, the question of our injury was not seriously controverted either. We had dead dolphins washing up on shore. The city had to remove them. The mayor, Supervisor Ladner, testified this devalued property interest. But what our district court said, what the Corps of Engineers argues, is we haven't really answered the question, what's it to you? And I think we should focus on that. That is the underlying question of Article III standing, right? That's what Justice Scalia says. What is it to you? Is there such a personal stake, quoting the Supreme Court in the outcome of the controversy, to assure that concrete adverseness that sharpens the presentation of issues? And the answer to that is yes, there is. We are not the interested bystanders that the court said should not be able to bring these cases because you don't get anything concrete enough. These are entities, local governments as well as businesses and associations, that are there in the line of fire from the Bonne Care spillway. So you're saying that New Orleans ought to flood so that the dolphins won't die? Absolutely not. Well, that goes to the problem for addressability. Yes, but let me address that. May I address that? Yeah. I think that you can talk about injury and we can talk about imminence and repeatability because you're highlighting two incidents, but there were two other emissions from the spillway when no dolphins died. And so you're asking to apply for some kind of take permit, or that they have to apply for a take permit. They do, and let me address two questions there. One, I will agree with you on this record, what Dr. Szilagyi said was 2011-2019, those were the years when he documented these very high mortality numbers. It's not in this record. He has had research come out this year that shows lesions and other injuries from looking at the period 2019 when there were all these openings. It's not in the record. I understand that, but I do want that to be clear. I don't want to let it be thought that Harrison County or the others want to do anything that's going to cause New Orleans to flood. What the incidental take authorization process does, though, is require a review of what the impacts are going to be on marine mammals and are there ways to mitigate those impacts. And that is a valuable process in itself that can look at alternatives to use a binocular spillway at a level that's going to kill and injure marine mammals. So it's not about flooding New Orleans. It's about looking at the options to mitigate harm to the governments and entities that are there in harm's way. What's a case that supports that theory of remedy? That's essentially the procedural remedy cases. When you go back to Bennett v. Speer and those kinds of cases where they said, look, if you have a process that is intended to protect your concrete interests, we cited the city of Sausalito case in our briefs. That was a case in which the city of Sausalito had the same sort of claim that we had here. They're saying, look, in that case it was Fort Baker out in the San Francisco area, and they said what you are planning to do, National Park Service, is going to harm the marine mammals there. And you're proposing to do it. You're going to take marine mammals, and you're saying you're going to do it without an incidental take authorization. And the court there said, yeah, this is a process that's intended to protect the concrete interests of entities like yourself, right, who have these significant interests in marine mammals. So there was, there is, this process is directly aimed at that. You seem like you have a question, Judge Ramirez. Am I not?  Now, Judge, if I could get to your second issue, right, that you raised, which is, yes, we have two instances in this record where we have 2011-2019, but we also have the threat, and that is, I think, the key here, of this happening again in the future. Now, there are a lot of formulations that have been used to look at the threat of future injury, but imminence, fairly likely, substantial risk, not conjectural. We have the evidence in the record that these kind of events are going to occur in the future. We cannot say they're going to happen next year. I will grant you that. We can't say they're going to happen two years from now. They are going to happen. It's like hurricanes. Enough to get past speculation. You know, it does not require a detailed number, Judge. Look at the Crawford v. Hines County case, right? That is the case involving a gentleman with a wheelchair who wished to exercise his right to vote. That relied on qualitative statements. Essentially, Hines County is a small county, only a subset of individuals are eligible for jury service, and those were not numeric sorts of issues. That was looking at the thing holistically, and I think that is what that standing test requires. Now, if I may, Judge, I would like to keep three minutes for rebuttal. If there are no other questions. Well, I thought you've already got five, so if you want to keep talking, you don't have to. I misread my timer. That's okay. We'll just stay on the point because, I mean, you know, that's what the case is turning on, whether you stay in court or not. I'm sorry? I'm just saying that's what the case is turning on, whether you stay in court. Judge Garola was, you know, familiar with the area. He's down on the coast, et cetera, et cetera. It looks like he was missing it in terms of, you know, all the data about the dolphins, et cetera, et cetera. I'm not saying whether he's right or not, but that's just the part to grapple with. What's enough here? I get the point about the wheelchair, but in this context with all this movement going on in the dolphins, et cetera, I mean. Yeah, Judge, sure. I think when you have a situation like this, right, that includes two severe impacts in an eight-year period, and we have the evidence from the best scientists in the United States in the record in the National Climate Assessment that says we're going to get increasing precipitation events here in the Midwest. I mean, we have an increasing trend of spillway openings. While there have been 15 openings since the spillway opened, they're clustered in the last 10 years or so. These are all in the record. When you take those things together and these significant impacts on two occasions, and when you say it's not fanciful, I think I would recast that. It's not conjectural, right? This is going to happen to us. And the judge focused on immediacy and on the term immediate, I think, immediacy in general. I think you have to read that from the cases together with those other articulations reasonably likely, right, not conjectural. So have we gone beyond conjectural? Is this something that these local governments and businesses have to get ready for? Yes, absolutely, because it's going to happen. The Corps is going to operate the spillway, and these impacts are going to occur. And I'll just say one other thing, a seminal case here, the Wuhan case, it talked about the speculative nature of future impacts in the context of something that a plaintiff could do something about. I have a question. Would you say the test, if you're able to establish inevitability, it doesn't matter if you can't show us evidence? Do you follow me? In other words, is it fair to say the argument is this is inevitable? We can't say it's going to happen tomorrow, but we can say it's inevitable. To the extent that we can show it's inevitable, that's sufficient without having to say it's imminent, i.e. next year or something. Yes. Again, I think when you take it together with the evidence we have produced, if we said it's inevitable over the next 200 years or 100 years or even 50 years, I would agree with you, Judge Stewart. That's difficult. Is that a fair reading of the expert's report? In so many words, to say it's not happening right now, but your clients, et cetera, to say this is an inevitability, why do we have to wait until it actually happens? Can I put it a slightly different way? Go ahead. I'm sorry. Answer it. We have a flood season every year, and the cases talk about the imminence of the threat. Every year we have flood season, we have the rains in the Midwest, and so if we have that threat, that is imminent. Okay. Thank you. Thank you. All right. Mr. Walters. May it please the Court. Raleigh Walters on behalf of the United States Army Corps of Engineers. For two reasons, the district court correctly dismissed this case for lack of jurisdiction. First, plaintiffs lack Article III standing. Second, plaintiffs' APA claims fall outside that statute's waiver of sovereign immunity. Plaintiffs invite the court to both stretch Article III beyond its limits and to rewrite the APA to authorize review of agency conduct that Congress never intended to put before courts, including hypothetical future agency conduct that hasn't even occurred. The court should reject plaintiffs' invitation to distort not just one area of law, but two areas of law that go to the core of judicial power. On standing, the first point I want to emphasize is that plaintiffs are seeking prospective relief against conduct that ended nearly five years before they filed their complaint. Plaintiffs filed this APA suit in January of 2024 seeking injunctive and declaratory relief, and plaintiffs had to bring this case under the APA because the Marine Mammal Protection Act does not provide a cause of action. But the only alleged final agency action that is identified in plaintiffs' complaint and in their briefing are the 2019 spillway openings. Now, we dispute that spillway openings are, in fact, final agency action, but I'll spot that to plaintiffs for the purposes of our standing argument. Those 2019 spillway openings were not threatening plaintiffs with imminent harm when they filed the suit in January 2024, and any injuries stemming from that wholly past conduct are not redressable by prospective relief, so plaintiffs have to rely on the prospect of future injuries stemming from future spillway openings. But again, assuming that spillway openings are final agency action, plaintiffs do not have standing to challenge hypothetical future final agency action that hasn't occurred. Those future actions are not before the court because the APA does not authorize relief against hypothetical future final agency action. Indeed, the whole notion of future final agency action is an oxymoron because agency action can't be final if it hasn't occurred, and this is relevant to the standing argument because it goes to redressability. Even if plaintiffs allege an incoming injury, they cannot prove, or cannot show, I should say, that the court could redress those injuries because the APA does not authorize relief against final agency action that hasn't occurred. But putting aside those fatal APA defects, plaintiffs' theory of future injury hinges on a highly attenuated chain of events that's far too speculative to support injury in fact, and the requested relief is not likely to address those injuries in any event. On injury in fact, future injuries must be imminent. That is, they must be certainly impending, and there must at least be a substantial risk that those injuries are going to occur. But plaintiffs' own theory depends on a series of events that are too speculative. First, they say projected weather patterns over the next several decades will lead to increased river flow and flooding. They say that will lead to future spillway openings of a sort similar to past spillway openings. They say that the openings will then cause dolphin strandings and dolphin takings within the meaning of the act. Then they say those dolphin strandings and takings will result in future injuries to the same economic, recreational, and aesthetic interests they allege here. This is pure speculation all the way down. First, it's speculative that plaintiffs' projected weather patterns will play out the way they predict. Second, it's speculative that the court will imminently open the spillway. The last time the court opened the spillway to divert flood water was in 2020, over five years ago, and the court has no current plans to open it in the future. But even if plaintiffs could show that a spillway opening was imminent, they still can only speculate as to whether that spillway opening will result in dolphin strandings and takings like they kindly allege here. That turns on a host of factors. For example, how long the spillway is open, because that determines how much fresh water is diverted into salt water. I'll note the spillway has been open several times in the 21st century. It was open in 2008, in 2011, in 2016, in 2018, twice in 2019, and in 2020. Plaintiffs allege that dolphins were injured only in the years 2011 and in 2019. So it's not inevitable that an opening of the spillway will harm dolphins. But even if plaintiffs could show that a spillway opening were imminent and that it's likely to harm dolphins, they still can only speculate as to whether that will result in harm to their own interests and cause injury to them. That also turns on a host of factors, such as where the dolphin strandings occur, whether anyone sees an injured dolphin, whether tourism is, in fact, affected, and a host of other factors. So this daisy chain of speculation layers conjecture on top of conjecture and falls far short of Article III's requirement that a future injury be certainly impending. I think that's what distinguishes this case from Crawford. In Crawford, there was just one contingency, whether the plaintiff was going to be called again for jury service. If he was called again for jury service, he would necessarily and certainly suffer injury because he could not access the courthouse. And the court noted that he lived in a small town with a small pool of eligible jurors, and the court noted that he had been called for jury service twice in the previous five years, so it was likely that he would be called again for jury service. And if he was called again for jury service, he would necessarily suffer injury. Here, plaintiffs depend on four contingencies that are too speculative to support injury. Turning to redressability, it has to be likely that the requested relief would redress plaintiff's injuries. Here, redressability turns entirely on the actions of a third party, the National Marine and Fishery Service, NMFS. Even if the court were to order the Corps to apply for an incidental take authorization, NMFS may grant that authorization, in which case the spillway would be open and dolphins under plaintiff's theory would be injured. And it's not clear what conditions NMFS could possibly impose on spillway openings that could mitigate the harm because the Corps is under a statutory obligation to open the spillway when the river flow exceeds a certain threshold. This is an important point. The Corps has no discretion when it's opening the spillway in terms of the trigger. The trigger is set by a statute. It's one and a quarter million cubic feet per second. When the river flow meets that threshold, the Corps opens the spillway, and NMFS could not change that by imposing conditions that prevent the Corps from opening the spillway. And plaintiffs can't clear this Article III hurdle by recasting their theory as a procedural one. In procedural injury cases, the injury-causing party fails to adhere to some procedural requirement that is designed to protect the concrete interest that is the basis for standing. But here the alleged injury-causing party, the Corps, did not fail to adhere to any procedure. The only procedure that plaintiffs identify is notice and comment, but that obligation falls on NMFS, not on the Corps. Because the Corps has no obligation to apply for an incidental take authorization, plaintiffs have no right to the procedures that follow the application for incidental take authorization. But even if there were a procedure here that the Corps allegedly failed to adhere to, that merely relaxes redressability and immediacy. Injury, in fact, is still a hard constitutional floor. And here plaintiffs are asserting a hypothetical future procedural injury that they can only speculate will result in harm to their concrete interest. For all the reasons I've stated, it's mere speculation that a future spillway opening will result in harm. And if that's the case, plaintiffs would be left with nothing but a bare procedural violation or a procedural violation in vacuo that cannot support injury, in fact, under Summers. So for all these reasons, we urge the Court to affirm the decision below dismissing this case for lack of standing. But the Court could also affirm on the alternative ground that plaintiffs' claims do not meet the APA's requirements for the waiver of sovereign immunity. As relevant here, there's no waiver of sovereign immunity unless plaintiffs challenge final agency action and show that the Corps failed to carry out a mandatory duty. Starting with final agency action, the opening of the spillway is neither agency action nor final agency action. Agency action is a term of art under the APA, and it does not embrace all conduct that an agency may engage in. The APA defines agency action as a, quote, rule, order, license, sanction, relief, or the equivalent thereof, or failure to act. An opening of the spillway is not analogous to any of these things, nor is it final agency action, because it's merely the implementation of a preexisting policy, the policy set by Congress in 1928. And I would direct this Court to two of the cases we cited in our brief, Wild Fist Conservancy from the Ninth Circuit and Village of Bald Head Island from the Fourth Circuit, which held that implementation of a preexisting policy is not final agency action. I'd also direct the Court to your prior decision in Harrison County, where it concerned a slightly different issue as whether opening the spillway is major federal action under NEPA. But the way the Court described spillway operations aligns precisely with what these other two circuits have said is not final agency action. And, again, even if there was final agency action here, even if opening the spillway is final agency action, the only one identified in the complaint is the 2019 spillway openings, and plaintiffs cannot get relief against hypothetical future final agency actions. Otherwise, the plaintiffs would be able to evade the finality requirement in the APA entirely. And second and finally, there's no mandatory duty to apply for an incidental take authorization. I direct the Court to the statutory text. This is Section 101A5A of the Marine Mammal Protection Act at 16 U.S.C. Section 1371A5A. It says in relevant part, upon request, the Secretary shall allow the incidental taking of marine mammals if he makes certain findings. There is no discrete mandatory duty here to apply for an incidental take authorization. That is a discretion. It's entirely the applicant's discretion. If they choose to seek an incidental take authorization and then take marine mammals, they're protected from liability. If they don't apply and obtain one, they take their chances when they engage in activity that may result in the taking of marine mammals. It's entirely the decision of the applicant. Plaintiffs, in fact, never argue that there's an independent duty to apply for an incidental take authorization. What they argue is that it's unlawful to take marine mammals without having an incidental take authorization. If the Corps were to open the spillway without obtaining an incidental take authorization and no harms to dolphins occur, plaintiffs would not say that. My understanding is that plaintiffs would not say we violated the statute. It's only a requirement under their theory to have an incidental take authorization when there is, in fact, a taking. And there, the unlawful action is the taking. It's not the failure to apply for an authorization. Then finally, the application for an incidental take authorization is not agency action. Even for failure to act claims, the agency had to fail to engage in agency action under the APA. And applying for this permit is not a rule, order, license, sanction, relief, or the equivalent thereof. I'm happy to stop there. I can answer any questions the Court may have. But if not, we'll rest on our briefs. Counsel opposite mentioned the Sausalito case. Yes, sir. So that case from the Ninth Circuit we think was wrong. But in any event, it was discussing the zone of interest test for statutory standing. It was deciding whether plaintiffs in that case fell within the zone of interest protected by the Marine Mammal Protection Act. It was not a holding that the Corps has an obligation to apply for an incidental take authorization. In fact, the Court never reached the merits of the Marine Mammal Protection Act claim in that case. They merely decided that the plaintiffs fell within that statute zone of interest. So we don't think it's in any way analogous to this case. I see. And what was the nature of the Army Corps activity? What was that going to be? I'm sorry. I don't believe the Army Corps was a defendant in that case. But the federal project was, I believe, building a military base.  And I don't believe the Army Corps was a party. I'm sorry I misspoke. But we, again, don't think that case is analogous to this one because it addressed a different issue and then never reached the merits of the Marine Mammal Protection Act claim. For all these reasons, the Army Corps respectfully requests that the Court affirm the decision below dismissing this case for lack of jurisdiction. Thank you. All right. Thank you, sir. Mr. Weigel. Thank you. Let me try to take some of these in order. First, there's the assertion that cannot be entitled to any prospective relief based on the 2019 opening of the spillway that, again, it's not controversial, took bottlenose dolphins. We have asked for declaratory judgment that action was in violation or was contrary to law under the Administrative Procedure Act because it violates the ban on takings in the Administrative Procedure Act. I understand the assertion is that, well, that doesn't do you any good now because it won't get you anything in the future. I don't think that's right. I believe a declaration by the Court that that was contrary to law is something that the Corps would have to pay attention to and is going to protect us from future actions of that nature. Now, there's also the assertion that there's no mandatory duty here to apply for an incidental take authorization. This is an either-or statute. If you take without the incidental take authorization, you're in violation of the law, which is one of the things that we put. It's action contrary to law. Or you have to get the incidental take authorization. So the statute itself is the underlying mandatory duty. Don't take unless you get the incidental take authorization. Well, can't you sue them if there was a future event and the dolphins washed up on the shores? I'm sorry? Can't you sue Army Corps and the Court of Claims if there were a future take and dolphins washed up on the shore? Yeah. Your Honor, I understand. If that violated the law. Well, the Court of Federal Claims, that would be for money damages. Right. Against the government. The court, as I appreciate it, has a very broad exemption from damage claims for flood control measures. I see. Yeah. So it's not an avenue that's open to us. I think your question is pertinent because if we had $1 in exemplary damages, we would not be having this argument here today. The question is, if we go back to first principles again, are we just interested bystanders here, having been harmed the way we are and having the threat of future harm, which we have introduced evidence on? I understand the argument here is, well, it's too hypothetical. It's highly attenuated. You've got to have weather. You have to have the Corps open the spillway for a certain period of time. You have to have the dolphins washed up. These things have occurred and if we have the same set of circumstances, it's happened twice again, as the evidence indicates, it's going to at some point, those things are going to occur. There are steps here, but those are not highly attenuated or hypothetical. If I was here arguing that's going to happen without that having already happened, I think there might be a point there where we are now. Those things are within that zone of reasonably likely, not conjectural. Is that conjecture that that's going to happen to us again on the facts in this record, knowing it's uncontroverted that the taking has happened twice? No, it's not. So, again, go back to first principles. I mean, we are not interested bystanders roaming the countryside. These are entities that are trying to protect their citizens and trying to address this issue. The question that says there's no procedure for applying for an incidental take authorization, again, that goes back to the statute. It says either don't take or get your incidental take authorization. And that incidental take authorization application process requires a lot of information and requires looking at the evidence. I guess my question is, yeah, and this goes to redressability, because if they grant a take permit, then you gain nothing. And if he is correct that the Corps has a statutory trigger for when they must release water through this spillway, then I don't see what the Fish and Wildlife or whoever it is can speculate about alternatives that aren't allowing exactly what you claim has injured the entities before. Can I take this in order? Sure. Judge, as to the first one, on redressability, when you're talking about procedural injury, as long as the procedure is intended to protect your concrete interests, which this is, you're only required to show the possibility. So even if we lose, we win. I know, but there's no possibility, I guess. That's what I'm saying. Judge, respectfully, I would say I think there is a possibility that you could look at utilizing other aspects of the Mississippi River and Tributaries Project. And that goes to the second point, which is while we disagree with our colleagues at the Corps of Engineers about whether that statute is mandatory, but the Corps has discretion within the boundaries set by that statute to operate the different elements of the Mississippi River and Tributaries Project. And not only that, they could look at other actions that could be taken in terms of levees, other diversions, and things of that nature that would take pressure off the bonnet carry spillway. Time is up. If there are no further questions. All right. Thank you. Thank you.